DECISION
This is an appeal from a decision of the Zoning Board of Review of the Town of Westerly ("the Board"). The Board granted Apple Health Care, Inc.'s ("Apple's") application for a special use permit to construct a 5,400 square foot addition to a nursing home that is an already-existing, legal nonconforming use. The plaintiffs — Thomas Sculco, Cynthia Sculco, and Margaret Shields ("plaintiffs") — are neighbors who own property within 200 feet of the subject nursing home. Jurisdiction in this court is pursuant to G.L. 1956 § 45-24-69.
 Facts/Travel
Brian J. Foley ("Foley") owns property located at 79 Watch Hill Road, in Westerly, Rhode Island ("the property"). The property is designated as Assessor's Lot 24 on Plat 137. Foley's Corporation, Apple, operates a nursing home called the Watch Hill Manor ("Home") at that location. The property is located partially in an R-30 residential zone and partially in a B-1 limited business zone. Neither zone permits nursing homes as a use. (8/6/97 Tr. at 114, 9/3/97 Tr. at 87).
The building in which the Home is located was originally built in 1910. It was used as a residential house until its expansion and conversion into a nursing home in 1959. (9/3/97 Tr. at 104). Pursuant to § 5.2 (A) of the present Westerly Zoning Ordinance ("Westerly Ordinance") which became effective December 15, 1995, Apple is permitted to continue operating the nursing home as a legal nonconforming use.
 Section 5.2 (A) provides:
 "(A) Continuance of existing uses. Buildings and land in use in a manner not conforming to the provisions of this ordinance at the time of its passage shall be considered nonconforming uses and shall be permitted to continue until such time that such use is discontinued, destroyed, demolished or changed."
The building contains 21,654 square feet of total floor space which is spread among three levels. The basement consists of storage rooms, a laundry, a boiler room, and a workshop. (8/6/97 Tr. at 25-7). In 1992, the Rhode Island Department of Health ("Health Department") determined that the second floor of the Home did not comply with current Health Department regulations and ordered Apple to cease using that area to house patients. (8/6/97 Tr. at 7). As a result, the nursing home's bed-capacity dropped from fifty-eight to fifty-two beds. The aforesaid second floor is now used for administrative offices in connection with running the nursing home, and the first floor is the only floor that houses patients. (8/6/97 Tr. at 101-2).
The Health Department has since threatened to preclude Apple's using the first floor of the original wing for residential purposes due to similar health regulation infractions. Apple has been granted only temporary waivers to continue operating the first floor for residential use. If Apple is forced to stop using that area as residential space, the Home stands to lose ten more beds. (8/6/97 Tr. at 7). Faced with the possibility of losing its certification as a 60-bed nursing home, Apple submitted plans to the Westerly Zoning Board and requested a special use permit to expand the nursing home pursuant to § 5.2 (E).
Apple's plans for the expansion include transferring the ten, barely-conforming, first-floor beds from the old wing to the new wing and adding eight new ones. (8/6/97 Tr. at 9). The new wing will also include a dining room and recreation and bathing facilities. (8/6/97 Tr. at 8, 37-8). The old wing will no longer be used as patients' living quarters. Instead, it will be utilized as physical therapy rooms or as an activity area. (8/6/97 Tr. at 8).
On August 6, 1997, the Board held an advertised, public hearing to consider Apple's application. Apple offered the testimonies of Mary Yakey ("Yakey"), the administrator of the Home; John Szefer ("Szefer"), an architect who did some of the architectural plans and designs for the new addition, Robert E. Sonnichsen ("Sonnichsen"), from Delta Environmental; Leon Tunnicliff ("Tunnicliff"), the building engineer and maintenance person at the Home; and Michael Lenihan ("Lenihan"), a local real estate professional in Westerly.
Yakey explained the circumstances surrounding the closing of the old wing's second floor as a residential unit and the danger of the first floor's waiver being revoked. Yakey also discussed the planned facilities for the new wing. (8/6/97 Tr. at 7-9).
Szefer gave testimony concerning the scope and layout of the intended expansion and represented that the new addition's basement would not be utilized, under the present design, although it could be used, in future expansion, for storage. (8/6/97 Tr. at 22-3). Szefer also illustrated how he calculated existing floor space for the purposes of conforming to permitted expansion. (8/6/97 Tr. at 23-9).
Sonnichsen presented as to the flowage requirements of a nursing home and informed the Board that both the Watch Hill Manor's present septic system and the proposed one for the addition are entirely adequate. (8/6/97 Tr. at 47-8). He also concluded that the expansion would have little effect on the surface, water storm drainage from the site. (8/6/97 Tr. at 49-51).
Tunnicliff discussed the use of the present basement storage area and clarified the pattern of the septic system's maintenance. Tunnicliff explained that each septic system was pumped semiannually. Although Apple's pumping company pumped septic systems at the Home four times per year, the company alternated the septic tanks it pumped each time it went to the Home, rather than pumping all of the tanks on the same visit. (8/6/97 Tr. at 96-7).
Lenihan discussed the criteria for approving a special use permit and presented testimony concerning the expansion's compatibility with existing uses. Lenihan indicated that the expansion will neither create a nuisance, nor hinder the future development of the town. Lenihan further averred that the addition would have no depreciable effect on surrounding property. (8/6/97 Tr. at 110-12, 117-18).
The August 6 hearing was continued to September 3, 1997. In the interim, the Board visited the Home on August 27, 1997. At the September 3 hearing, plaintiffs called the following witnesses: Cynthia Sculco ("Sculco") and Margaret Shields ("Shields"), two of the plaintiffs and abutting property owners; Joseph W. Frisella ("Frisella"), a professional consultant engineer and land surveyor; and Stephen McAndrew ("McAndrew"), a licensed real estate broker and certified appraiser.
Sculco testified as to the nursing home's incompatibility with the environmentally-sensitive area in which it is located. She also complained about an alleged odor emanating from the Watch Hill Manor's septic system, which she claims was especially noticeable in the summertime. (9/3/97 Tr. at 26-7).
Shields stated that the delivery, garbage, and snack trucks, which service the nursing home, enter onto her property to turn around. Shields also claimed that she sometimes finds medical waste on her property and, on a few occasions, has noticed a septic smell emanating from the nursing home. (9/3/97 Tr. at 28-9).
Frisella told the Board that the 5,400 square foot expansion was not within the permitted 25% expansion limit, because the existing basement was unused space and should not be considered when doing the calculations. (9/3/97 Tr. at 39-40, 41-4). He further stated that the size of the proposed expansion was 10,800 square feet rather than 5,400 square feet, because the basement area of the proposed expansion is designed as usable space. (9/3/97 Tr. at 47).
McAndrew testified that the existing basement should not be used in calculating the 25% expansion. McAndrew also opined that the expansion was not in conformity with Westerly's Comprehensive Plan. (9/3/97 Tr. at 93-7).
The Board concluded the hearings on September 3, 1997. The decision was rendered on October 1, 1997, at which time the Board approved Apple's application for a special use permit to expand the nursing home. It found that the 5,400 square foot addition was in compliance with § 5.2 (E) of the Westerly Ordinance, which permits the expansion of a nonconforming use by no more than 25% of the existing floor space, or use area, of the nonconforming use. (10/1/97 Tr. at 6-7). The Board also determined that the proposed expansion is compatible with neighboring uses. It further concluded that the expansion would neither create a nuisance in the neighborhood, nor hinder the future development of the Town of Westerly, as set forth in its Comprehensive Plan. (10/1/97 Tr. at 7-8, 10). See § 3.4 (E) of the Westerly Ordinance, Standards for Special Use Approval.
Along with its grant of the special use permit, the Board "place[d] a restriction on any further expansion of this nursing home from this point on, regardless of any change in upcoming zoning ordinances . . ." (10/1/97 Tr. at 11). To further ensure that there would be no future expansion, the Board required that Apple limit the height of the concrete walls of the addition to only four to five feet, the height of the crawl space beneath, and leave the basement unfinished. (10/1/97 Tr. at 9-10, 12).
The plaintiffs filed a timely appeal to this court. On appeal, plaintiffs argue that the proposed expansion violates § 5.2 (E) of the Westerly Ordinance, which permits the expansion of a nonconforming use by no more than 25% of the area, or floor space, of the nonconforming area already existing at the time the relevant ordinance was passed. Plaintiffs claim that the Board exceeded its authority by granting the application for the special use permit because it was not in conformance with the Comprehensive Plan. The plaintiffs further maintain that the Board abused its discretion by failing to consider evidence of existing nuisances on the site.
 Standard of Review
Superior Court review of a zoning board decision is controlled by G.L. 1956 (1991 Reenactment) § 45-24-69 (D), which provides:
 "45-24-69. Appeals to Superior Court
 (D) The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) In violation of constitutional, statutory or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing a decision of the zoning board, a justice of the Superior Court may not substitute his or her judgment for that of the zoning board if he or she conscientiously finds that the board's decision was supported by substantial evidence.Apostolou v. Genovesi, 120 R.I. 501, 507, 388 A.2d 821, 825 (1978). "Substantial evidence as used in this context means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means an amount more than a scintilla but less than a preponderance." Caswell v. George Sherman Sandand Gravel Co., Inc., 424 A.2d 646, 647 (R.I. 1981) (citing,Apostolou, 120 R.I. at 507, 388 A.2d at 824-25). The reviewing court "examines the record below to determine whether competent evidence exists to support the tribunal's findings." New EnglandNaturist Ass'n. Inc. v. George, 648 A.2d 370, 371 (R.I. 1994) (citing Town of Narragansett v. International Association of FireFighters, AFL-CIO, Local 1589, 119 R.I. 506, 380 A.2d 521
(1977)).
 Special Use Permit
The Board's power to grant a special use permit emanates from § 45-24-57, which provides: "A zoning ordinance adopted pursuant to this chapter shall provide that the zoning board of review shall: (A) Have the following powers and duties: . . . (5) To authorize, upon application, in specific cases, special use permits, pursuant to § 45-24-42 (A), where the zoning board of review is designated as a permit authority for special use permits,. . . ."
 Section 45-24-42 provides:
 "45-24-42. General provisions — Special use permits.
 — A zoning ordinance shall provide for the issuance of special use permits, which shall be approved by the zoning board of review. The ordinance shall:
 (1) Specify the uses requiring special use permits in each district;
 (2) Describe the conditions and procedures under which the special use permits, of each or the various categories of special use permits established in the zoning ordinance may be issued;
 (3) Establish criteria for the issuance of each category of special use permit, that shall be in conformance with the purposes and intent of the comprehensive plan and the zoning ordinance of the city or town; . . ."
In accordance with § 45-24-42, the Town of Westerly enacted § 3.4 (E) of the Westerly Ordinance. Section 3.4 (E) provides:
 "(E) Standards for Special Use Permit Approval. The Zoning Board of Review shall grant a special use permit only upon specific findings that the proposed development meets all of the following standards:
 (1) It shall be compatible with neighboring uses.
 (2) It will not create a nuisance in the neighborhood.
 (3) It will not hinder the future development of the Town as set forth in the Comprehensive Plan."
When a legislative body leaves the determination of whether or not a use should be authorized by the zoning board of review by special exception, "it is a condition precedent to the exercise of the board's jurisdiction that a grant of the use sought must be found by said board as not inimical to the public health, safety, morals and welfare." Id. rat 254 (citing Nani v.Zoning Board of Review of the Town of Smithfield, 242 A.2d 403, 406 (R.I. 1968)).
 Expansion of Nonconforming Use
As a legal nonconforming use, the Home is limited to an extension or expansion of no more than twenty-five percent of the nonconforming use area that existed at the time the relevant ordinance designated the use nonconforming. See § 5.2 (E) of the Westerly Ordinance. Section 5.2 (E) provides:
 "(E) Extension or Addition to a Nonconforming Use. A legal nonconforming use shall be extended or added to only by special use permit, such expansion shall not exceed 25 percent of the floor space or area use of the use at the time of passage of this Ordinance . . . Where a use already in existence at the time of the passage of this Ordinance is under the Ordinance only permitted by special use permit, the use shall be considered nonconforming and a special use permit shall be required for any extension or addition of the same."
Plaintiffs insist that the Board erred as a matter of law by utilizing improper figures to calculate the ratio of the proposed expansion to the nonconforming floor space, or area of use, that existed ("existing floor space") at the time the relevant Westerly Ordinance was passed. Plaintiffs argue that the floor space of the existing basement and the area of the second floor should not have been included in calculating the total existing floor space. They claim that since neither the basement nor the second floor is used to house the nursing home residents, neither is part of the nonconforming use. As such, plaintiffs maintain that Apple is not entitled to the benefit of that floor space in calculating the number of square feet Apple may expand the Home.
Alternatively, the Board, Apple, and Foley ("appellees") claim that the Board properly counted the floor space of the existing basement and second floor in performing its calculations. They argue that, although the basement and second floor are not utilized as living quarters for residents, they are still part of the nonconforming aspect of the nursing home. The appellees insist that the boiler room, lunch room, laundry facility, workshop, storage rooms, and administrative offices are all nonconforming uses, because they are all used for a nursing home.
The members of the Board visited the Home on August 27, 1997. They found that the basement area contained a kitchen facility, workshop, heating, custodial space, office space, and laundry, and that "all of these areas were directly supporting the [sic] nonconformlng use . . .". (10/1/97 Tr. At 9). The Board considered the definition of "use," which is defined by the Westerly Zoning Ordinance as "the principal purpose or activity for which land or buildings are designed, arranged, or intended, or for which land or buildings are occupied or maintained." See
Westerly Ordinance, § 13.1 (A)(90).[1] The Board found that the "use" in this case is the nursing home and further determined that the entire building was one "use." (10/1/97 Tr. at 6). The Board went on to hold, "[t]he basement floor area is part and parcel of the nursing home. It serves a specific function which cannot be conducted elsewhere on the premises. The 21,652 square feet, counting the cellar, first floor and second floor is appropriate, and the proposed 5400 square foot addition is proper." (10/1/97 Tr. at 6-7).
The Board had before it conflicting expert testimony concerning whether or not the basement and/or second floor area should be considered as part of the existing floor space. Where the record shows conflicting evidence from two equally qualified experts, and substantial evidence exists on both sides of the controversy, the Board is entitled to weigh the evidence and judge the credibility of the witnesses. Under such circumstances, as are present in the instant case, the court will not substitute its judgment for that of the Board's. See Mendonsa v. Corey,495 A.2d 257 (R.I. 1985). Additionally, where a zoning board makes an inspection of the subject property, it may base its findings on knowledge obtained during that inspection. Coderre v. ZoningBoard of Review of the City of Pawtucket, 251 A.2d 397, 400 (R.I. 1969), see also Perron v. Zoning Board of Review of The Town ofBurrillville, 369 A.2d 638, 641-2 (R.I. 1977)(where the court determined that when a zoning board bases its decision upon its own inspection of the property, it must state, in the decision, what it viewed and what its impressions were).
Here, the Board visited and inspected the Home and the surrounding neighborhood. As its decision contains a detailed report of its observations, the Board's inspection constitutes legally competent evidence. See Perron, 369 A.2d at 641.
The plaintiffs have not presented any legal authority to support the contention that the Board erred in considering the basement and second floor as part of the nonconforming use, or existing floor space. The instant matter is distinguishable fromRaritan Development Corp. v. Silva, 689 N.E.2d 1373 (N.Y. 1997), in which the New York Court of Appeals determined that "cellar space" was not to be included in calculating floor area. In that case, the court based its decision on the fact that the relevant zoning ordinance specifically addressed and excluded cellar space from such calculations. Raritan, 689 N.E.2d at 1373-4. The Westerly Ordinance is silent as to the treatment and/or exclusion of both "cellar space" and "basement".
Consequently, this court will not substitute its own judgment for that of the Board's. Since the Board has validly decided that the area of the basement and second floor is part of the area of the nonconforming use, the total existing floor space to be used in calculating the permitted expansion is 21,652 square feet. The size of the proposed expansion, 5400 square feet, is less than 25% of 21,652 square feet. Accordingly, the Board's finding that Apple's proposed application complied with the expansion restrictions set forth in § 5.2 (E) does not constitute an error of law and is not in excess of the authority granted to it by statute or ordinance.
 Compatibility with Neighboring Uses
Pursuant to § 3.4 (E), the Board must look at the proposed development's compatibility with neighboring uses when considering an application for a special use permit. With respect to the instant proposal's compatibility with neighboring uses, the Board heard from Lenihan, Apple's real estate expert. Lenihan testified that the nursing home provides an ideal buffer between the business uses and the residential uses and represented to the Board that the expansion would be very compatible with existing uses in the area. (8/6/97 Tr. at 109). Lenihan also stated that the addition would not have a depreciable effect on neighboring property values. (8/6/97 Tr. at 117).
Based upon the evidence before it, the Board determined that the expansion would be compatible with neighboring uses. It held: "By allowing this expansion to take place, I feel that the building will be no more incompatible than it is now. It has been in place for some considerable time now, and there has been no conflict with other residential properties as well as other businesses located nearby . . . The issues of open space and preservation of scenic quality of the immediate surroundings appear to have been dealt with acceptably and responsibly." (10/1/97 Tr. at 7).
 Comprehensive Plan
Additionally, pursuant to § 3.4 (E), the Board must consider whether the proposed expansion is in compliance with the town's Comprehensive Plan. The plaintiffs' real estate expert, McAndrew, testified that the expansion would not be in conformance with the Comprehensive Plan. To support his testimony, he noted that the Westerly Ordinance specifically expresses concerns that nonconforming uses in the subject Avondale area "warrant closer inspection." (9/3/97 Tr. at 95-6).
Lenihan presented conflicting testimony as to the addition's effect on the Comprehensive Plan. He testified that the expansion would not hinder the future development of the Town. He explained that, instead, the addition to the nursing home would assist the medical facilities in the community and enhance the future development of the town. (8/6/97 Tr. at 110-12).
Based upon the testimony presented at the hearings the Board determined that the expansion would not be in contravention to the Comprehensive Plan. The Board held: "The expansion will not hinder the future development of the Town as set forth in the Comprehensive Plan. The plan does allow that the Town should provide for this type of housing to meet the needs of its population. Therefore, there does not appear to be a conflict here." (10/1/97 Tr. at 8).
 Nuisance: Health and Traffic
Pursuant to § 3.4 (E), the third element the Board must consider when deciding whether to grant a special use permit is whether the proposed expansion will create a nuisance in the neighborhood. Sonnichsen, the professional engineer, testified that, upon inspection of the present septic system, the system was working properly and was not even being used to full capacity. (8/6/97 Tr. at 61) Sonnichsen stated that he contacted the Rhode Island Department of Transportation to confirm that there would be no traffic impact from the expansion, the State Historic District to confirm that there were no issues related to the historic district that would be an impediment to the expansion, and the Coastal Resource Management Council to confirm what the coastal setback requirements would be. (8/6/97 Tr. at 44-6) He also contacted the Department of Environmental Management ("DEM") and the town planner. (8/6/97 Tr. at 45). Sonnichsen testified that the soil at the subject property is extremely good for leaching and is very effective in hydraulically disposing and safely renovating wastewater. (8/6/97 Tr. at 47-8). Sonnichsen further testified that there would be no significant increase in wastewater flow into Watch Hill Road and no negative impacts from storm water drainage off of the site. (8/6/97 Tr. at 50). Sonnichsen finished his direct testimony by stating that, "[to] this point we have designed a properly designed subsurface wastewater disposal system." (8/6/97 Tr. at 56).
Frisella, plaintiff's professional engineer, testified as to the site's drainage plan. Frisella claimed that, while the dead seepage pits will accommodate drainage presently, they will probably fail within five years. (9/3/97 Tr. at 66-7). Frisella further testified that, as a result, nutrients will escape from the property and nitrates will reach the bay, causing algae to grow. (9/3/97 Tr. at 70).
Concerns were raised, at the hearings and on appeal, about whether the existing and the proposed septic systems would create a nuisance. Concerns were also raised and addressed at the hearings, although not referenced on appeal, as to the expansion's compliance with parking regulations.
In response to these concerns, the Board made an overall determination that the proposed expansion would not create a nuisance in the neighborhood. The Board held: "The expansion will not create a nuisance in the neighborhood. The nursing home has been a good neighbor. The nursing home has been a legal nonconforming use for some time. The proposed expansion will be as innocuous as possible. The nursing home does provide an essential service to the Town of Westerly, giving an alternative lifestyle to our elderly." (10/1/97 Tr. at 8).
In Guiberson v. Roman Catholic Bishop of Providence,308 A.2d 503, 112 R.I. 252 (1973). a local zoning board failed to make a finding with respect to whether the granting of an exception "would overtax the neighborhood's sanitation and storm drainage system." Guiberson, 308 A.2d at 507, 112 R.I. at 259. Here, our Supreme Court held" . . . the effect of [said] development on the [municipal] sewer system is relevant to the question of whether the exception sought is reasonably necessary for the convenience and welfare of the public." Id.
Furthermore, with respect to the element of nuisance, the Board failed to make any findings with respect to whether the plans for the addition provided for adequate parking facilities. In Piccerelli v. Zoning Board of Barrington, 266 A.2d 249,107 R.I. 221 (1970). the court found that evidence of a traffic hazard is germane to an ultimate determination of whether the use, if permitted, would adversely affect the public convenience and welfare. Piccerelli, 266 A.2d at 253-4, 107 R.I. at 229. InPiccerelli, Colonial Laundries, Inc. applied to the Barrington Zoning Board of Review for a special use permit to operate a full-service dry cleaning business in a zone where it was not a permitted use. Neighbors objected to the application on the grounds that the business would create traffic hazards and noxious odors. The board in Piccerelli expressly found that the use sought by the applicant would not be inimical to the public welfare with respect to the noxious fumes, yet failed to consider the possibility of a traffic hazard. The board made no finding as to whether or not the dry cleaning business would cause a traffic hazard, even though it was obvious from the record, and from the board's decision, that it was a potential problem. As such, the court remanded the cause to the board for further hearing on the sole issue of whether the proposed use would create traffic problems inimical to public health and welfare. Piccerelli, 266 A.2d at 254-5, 107 R.I. at 230-1.
 In the instant case, the Board with respect to its decision generally noted:
 "[A]nd we also had to apply, you know, the standards that exist for permitting approval, and, you know, we had to discuss and determine in our own minds . . . whether or not expansion would create a nuisance in the neighborhood. . . . These are all considerations we had to give." (10/1/97 Tr. at 5-6).
After review of the record, this court finds that the instant Board, in granting the special exception, failed to make specific findings with respect to the septic system's and parking's effect on the health, safety, and welfare of the community. Accordingly, this matter is remanded to the Board for findings as to said septic systems and parking. This court will retain jurisdiction of the matter.
Counsel shall submit the appropriate order for entry.
[1] This definition mirrors the definition of "use" as provided in the Rhode Island General Laws § 45-24-31 (60).